## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Kinkeung Mok, derivatively on behalf of Tile Shop Holdings, Inc., | Court File No. _____ |
| Plaintiff, | |
| v. | |
| Robert A. Rucker, Peter J. Jacullo, III, Peter H. Kamin, Todd Krasnow, Adam L. Suttin, William E. Watts, and Fumitake Nishi, | **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** |
| Defendants, | |
| -and- | [REDACTED] |
| Tile Shop Holdings, Inc., | |
| Nominal Defendant. | |

Plaintiff Kinkeung Mok ("Plaintiff"), derivatively on behalf of Tile Shop Holdings, Inc. ("Tile Shop" or the "Company"), by his undersigned counsel, submits this Verified Shareholder Derivative Complaint (the "Complaint") against defendants Robert A. Rucker ("Rucker"), Peter J. Jacullo, III ("Jacullo"), Peter H. Kamin ("Kamin"), Todd Krasnow ("Krasnow"), Adam L. Suttin ("Suttin"), and William E. Watts ("Watts") (collectively, "Director Defendants"), and Fumitake Nishi ("Nishi") (together with Director Defendants, "Defendants"). Plaintiff alleges, upon personal knowledge as to his own acts and otherwise upon information obtained upon investigation by his counsel that he believes to be true, as follows:

## NATURE OF ACTION

1.     Plaintiff brings this shareholder derivative action against certain directors of Tile Shop Holdings, Inc. ("Tile Shop" or the "Company"), alleging breaches of fiduciary duty, unjust enrichment, and aiding and abetting arising out of Defendants' failure to properly safeguard the Company against mismanagement and wrongdoing.  As a public stockholder of Tile Shop, Plaintiff relied on Tile Shop's Board of Directors (the "Board") to exercise proper oversight over the Company's operations.

2.     Tile Shop retails manufactured and natural stone tiles, setting and maintenance materials, and related accessories in the United States.   Through approximately 90 stores in 28 states, Tile Shop sells over 4,500 products from around the world, including ceramic, porcelain, glass, and stainless steel manufactured tiles.   As of December 31, 2014, Tile Shop employs approximately 1,200 employees, 878 of which work in Tile Shop stores, 65 in corporate, store support, infrastructure or similar functions, and 247 in distribution and manufacturing.

3.     Director Defendants created Tile Shop in 2012 through a series of transactions by and between a number of owned and/or controlled entities.  Following these transactions, Director Defendants appointed themselves to Tile Shop's Board.  As members of the Board, Director Defendants owed the Company the fiduciary duties of loyalty, good faith, and oversight.   Director Defendants, as alleged in detail herein, breached these fiduciary duties and, as a result, Tile Shop is now a defendant in a class action securities fraud lawsuit which will likely cost the Company tens of millions of dollars to resolve. ██████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████    Further, Director Defendants' breaches resulted in horrible press for the Company and, as evidenced by Tile Shop's near all-time-low stock price, have left the investing public with a potentially permanent lack of confidence in the Company and the ability of its management to oversee its operations.  Tile Shop has been damaged by Director Defendants' conduct, and this Complaint seeks to hold them liable.

4.    The Board, however, failed to fulfill its fiduciary duties.

5.    During 2013, Tile Shop stores had been selling tiles containing amounts of lead in excess of the total lead content limit of the U.S. Consumer Product Safety Commission ("CPSC").  According to independent testing, in some cases, Tile Shop tiles contained lead concentrations of 13,900% greater than CPSC limits.  Tile Shop failed to report this to the CPSC in direct violation of federal law, 15 U.S.C. § 2064(b).

6.    The Company also failed to report a number of significant related-party transactions with several entities, including one named named Beijing Pingxiu, a Chinese export trading company that served as a middleman between Tile Shop and Chinese vendors.  Specifically, Beijing Pingxiu was controlled by Defendant Nishi, a longtime employee of Tile Shop who also happened to be the brother-in-law of the Company's President and Chief Executive Officer, Defendant Rucker.  The total amount of payments processed by and through Beijing Pingxiu during the years ended December 31, 2011, 2012, and 2013 was $6.3 million, $12.5 million, and $16.9 million, respectively, or

15.6%, 25%, and 24.5% of Tile Shop's costs of sales for the years ended December 31, 2011, 2012, and 2013, respectively.  Nishi profited personally as a result of these related-party transactions by receiving fees from the various vendors with which he worked. According to Nishi, these fees totaled $1.1 million and were provided by the various vendors in exchange for consulting services. ███████████

███████████████████████████████

███████████████████████████████

███████████████████████████████

███████████████████

7.      Plaintiff became aware of the Board's breaches of fiduciary duty by reading two articles: the first was an article written by a boutique research firm named Infitialis Research Collective ("Infitialis") dated October 21, 2013, titled "The Tile Shop: Poisoned Tile, Bad Actors, Unsustainable Margins, And A Stock Ready To Crack" (the "Lead Tile Article"); and the second was an article written by Gotham City Research LLC ("Gotham") dated November 14, 2013, titled "The Tile Shop: Like Crazy Eddie's, But With An Undisclosed Related Party and A Chinese Twist" (the "Related Party Report").

8.      After reviewing the articles, Plaintiff pursued further information by way of a books and records inspection pursuant to Delaware General Corporation Law § 220 in an attempt to assess the validity of the accusations raised in the Lead-Tile Article and Related-Party Report and to determine what, if any, wrongdoing and/or mismanagement was occurring within the Company's operations.

9.     Plaintiff received a number of documents in response to his demand.  These documents, which are discussed in detail below, evidence an absence and/or significant deficiency within the Company's system of internal controls.  The absence of and/or severe deficiency within internal controls requires that Director Defendants be held liable for failing to properly oversee the Company.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction pursuant to 28 U.S.C. § 1332, as there is complete diversity between Plaintiff and Defendants (including Nishi), and the amount in controversy exceeds $75,000.

11.     This Court has jurisdiction over each Defendant (including Nishi) because each defendant is either a corporation that does sufficient business in Minnesota, or is an individual who has sufficient minimum contacts with Minnesota so as to render the exercise of jurisdiction by the Minnesota courts permissible under traditional notions of fair play and substantial justice.  This action is not a collusive one to confer jurisdiction on this Court which it would not otherwise have.

12.     Venue is proper in this Court pursuant to 28 U.S.C § 1391 because one or more of the defendants either resides in or maintains executive offices in this District, a substantial portion of the transactions and wrongs complained of herein, including Defendants' primary participation in the wrongful acts detailed herein, occurred in this District, and Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

**PARTIES**

13.     Plaintiff is a stockholder of Tile Shop and has been a stockholder of Tile Shop continuously since May 2013.  Plaintiff is a resident of New York.

14.     Tile Shop was created in 2012 through a series of transactions by and between entities owned and/or controlled by Defendants.  Pursuant to a "Contribution and Merger Agreement" dated June 27, 2012, Tile Shop was created through a merger and business combination between JWC Acquisition Corp., on the one hand, and The Tile Shop, LLC ("Tile Shop Predecessor"), on the other hand.  Tile Shop is a publicly traded Delaware corporation, with its executive offices located at 14000 Carlson Parkway, Plymouth, Minnesota 55441.  Tile Shop is a leading specialty retailer of manufactured and natural stone tiles, setting and maintenance materials, and related accessories in the United States.  Tile Shop's ticker symbol on the NASDAQ Global Select Market is "TTS".

15.     Rucker was the President and Chief Executive Officer of Tile Shop from June 2012, and a member of Tile Shop's Board from June 2012, until he announced his resignation as Chief Executive Officer on October 28, 2014.  Prior to his position at Tile Shop, Rucker co-founded Tile Shop Predecessor in or about 1985.  Since at least 2002, Rucker served as its President and Chief Executive Officer, and was a member of its board of managers.  Upon information and belief, Rucker is a resident of Minnesota.

16.     Jacullo has served on Tile Shop's Board since August 2012.  Jacullo serves as a member of the Board's Audit Committee and Compensation Committee.  Previously, Jacullo served as a member of Tile Shop Predecessor's board of managers.  Since July

1987, Jacullo has consulted for companies affiliated with, and co-invested alongside, ILTS, LLC, and its affiliates, including in Tile Shop Predecessor.  Upon information and belief, Jacullo is a resident of Connecticut.

17.     Kamin has served on Tile Shop's Board since August 2012.  Kamin serves as the Chairman of the Board's Audit Committee and a member of the Board's Nominating and Corporate Governance Committee.  Previously, Kamin served as a member of Tile Shop Predecessor's board of managers from January 2012, to August 2012.  Upon information and belief, Kamin is a resident of Massachusetts.

18.     Krasnow has served on Tile Shop's Board since August 2012.  Krasnow serves as the Chairman of the Board's Compensation Committee and Nominating and Corporate Governance Committee.  Previously, Krasnow served as a member of Tile Shop Predecessor's board of managers from January 2012 to August 2012.  Upon information and belief, Krasnow is a resident of Massachusetts.

19.     Suttin has served on Tile Shop's Board since August 2012.  Suttin serves as a member of the Board's Audit Committee.  Previously, Suttin served as President of JWC Acquisition Corp.  In 1995, Suttin co-founded J.W. Childs Associates, L.P., a private equity investment firm.  Upon information and belief, Suttin is a resident of Massachusetts.

20.     Watts has served on Tile Shop's Board since August 2012.  Watts is Chairman of Tile Shop's Board and serves as a member of the Board's Compensation Committee.  Previously, Watts served as Vice President of JWC Acquisition Corp.  Watts

has been an operating partner of J.W. Childs Associates, L.P., since June 2001. Upon information and belief, Watts is a resident of Pennsylvania.

21.     Nishi joined Tile Shop Predecessor in or around 2002 and, upon the creation of Tile Shop, served as an employee of Tile Shop until January 1, 2014, when he was terminated from his position. As an employee, his title was "purchasing supervisor" and he was responsible for ordering inventory from China. Nishi personally received payments from representatives of certain vendors between 2011 and 2013. Nishi, while serving in the course of his employ for Tile Shop, collected at least $1.1 million in additional payments from Chinese vendors in exchange for what he described as consulting fees. Nishi was able to accomplish this through a series of related-party transactions between Tile Shop and companies that he either owned or controlled. Upon information and belief, Nishi is resides of China.

## SUBSTANTIVE ALLEGATIONS

22.     Tile Shop is a Delaware corporation with its headquarters in Minnesota. The Company went public in August 2012. As of February 20, 2015, the Company had 51,315,047 shares of common stock outstanding at a total market value of $569,597,021. Defendants Jacullo, Kamin, Krasnow, Rucker, Suttin, and Watts have been directors on Tile Shop's Board since the Company's initial public offering. Non-party Christopher Cook joined the Board in September 2014.

23.     As directors on Tile Shop's Board, Defendants owed to Tile Shop the duty to exercise loyalty, good faith, due care and diligence in the management and administration of the affairs of the Company and in the use and preservation of its

property and assets, and owed the duty of full and candid disclosure of all material facts related thereto.  Further, each Defendant owed a duty to Tile Shop to ensure that Tile Shop operated in compliance with all applicable federal and state laws, rules and regulations and that Tile Shop did not engage in conduct in knowing violation of applicable law.

24.     To discharge these duties, Director Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices, controls, and financial and corporate affairs of Tile Shop.  By virtue of this obligation, Director Defendants were required, among other things, to:

- Manage, conduct, supervise, and direct the employees, businesses and affairs of Tile Shop in accordance with federal laws;

- Neither violate nor knowingly or recklessly permit any officer, director or employee of Tile Shop to violate applicable laws, rules and regulations and to exercise reasonable control and supervision over such officers and employees;

- Ensure the prudence, honesty and soundness of policies and practices undertaken or proposed to be undertaken by Tile Shop;

- Exercise appropriate control and supervision over public statements to the securities markets by the officers and employees of Tile Shop, including supervising the preparation, filing and/or dissemination of any SEC filings, press releases, reports or other information disseminated by Tile Shop and examining and evaluating any reports of examinations or investigations concerning the practices, products or conduct of officers of Tile Shop and making full and accurate disclosure of all material facts, concerning *inter alia*, each of the subjects and duties set forth above;

- Remain informed as to how Tile Shop was, in fact, operating, and upon receiving notice or information of unsafe products, imprudent or unsound practices, to make reasonable investigation in connection therewith and to

take steps to correct that condition or practice—including the reporting of potentially hazardous products to appropriate authorities and/or regulators; and

- Preserve and enhance Tile Shop's reputation as appropriate for a public corporation and to maintain public trust and confidence in Tile Shop as a prudently managed institution fully capable of meeting its duties and obligations.

25.     Defendant Rucker, in his position as Chief Executive Officer, President, and director, bore direct responsibility for the supervision and oversight of Tile Shop's day-to-day operations, including (i) protecting Tile Shop against exposure to consumer liability arising from lead contamination and (ii) ensuring that Tile Shop complied with its various disclosure obligations concerning related-party transactions.

26.     Further, each of Director Defendants was required to comply with the Company's Code of Business Conduct and Ethics.  Tile Shop's current Code of Business Conduct and Ethics contains a section titled "Compliance with Laws."  Section 5 of this section is titled "Health, Safety and Environment" and states as follows: "The Company is dedicated to conducting its business activities and operations in a manner that promotes protection of people and the environment to the extent possible.   Accordingly, [e]mployees and directors of the Company shall comply with all applicable environmental, health and safety laws and shall report noncompliance with such laws to the Company pursuant to the instructions set forth herein."  Tile Shop's Code of Business Conduct and Ethics also contains a section titled "Disclosure" which provides in pertinent part: "Each Employee and director, to the extent involved in the Company's disclosure process, . . . shall familiarize himself or herself with the disclosure requirements

applicable to the Company as well as the business and financial operations of the Company and shall not knowingly misrepresent, or cause others to misrepresent, facts about the Company to others . . . ."  Director Defendants' obligations with regard to Tile Shop's Code of Business Conduct and Ethics required them to ensure compliance with all applicable federal laws, including but not limited to 15 U.S.C. § 2064(b).

27.     Additionally, each of Director Defendants was required to comply with Tile Shop's policies concerning related-party transactions, which, according to Tile Shop's "Business Ethics Policy" (effective January 1, 2005), prohibited an employee from "subvert[ing] the Company's interest to his or her own," and Tile Shop's "Policies and Procedures Regarding Related Person Transactions."  Tile Shop's stated "Policies and Procedures for Related Person Transactions"—which was administered by the Audit Committee of Tile Shop's Board—applied to "any transaction, arrangement, or relationship, or any series of similar transactions, arrangements, or relationships, in which [Tile Shop is] to be a participant, the amount involved exceeds $50,000[,] and a related person had or will have a direct or indirect material interest."  Pursuant to the policy, the Audit Committee was required to "(i) review the relevant facts and circumstances of each related person transaction, including if the transaction is on terms comparable to those that could be obtained in arm's-length dealings with an unrelated third party and the extent of the related party's interest in the transaction, and (ii) take into account the conflicts of interest and corporate opportunity provisions of our code of business conduct and ethics."  Directors, director nominees, and executive officers were required to present to the Audit Committee each "proposed related person transaction to which such director,

director nominee or executive officer is a party, including all relevant facts and circumstances relating thereto, and will update the audit committee as to any material changes to any related person transaction."  Significantly, "related person transactions" were permitted only if the "audit committee ha[d] approved or ratified such transaction in accordance with the guidelines set forth in the policy."

28.    Tile Shop's "Business Ethics Policy" provided examples of "conflicts of interest," including "[o]utside employment during the employee's normal working hours," "[u]sage of Company equipment or Company personnel," "[o]wnership by an employee or by a member of their family of a significant interest in any outside enterprise which does or seeks to do business with or is a competitor of the Company," "[s]erving as a director, officer, partner, consultant, or in a managerial or technical capacity with an outside enterprise, which does or is seeking to do business with or is a competitor of the Company," "[a]cting as a referral of business, broker, finder, go-between or otherwise for the benefit of a third party in transactions involving or potentially involving the Company or its interests, including with contractors," and "[a]ny other arrangements or circumstances, including family or other personal relationships, which might dissuade the employee from acting in the best interest of the organization."

29.    Director Defendants' obligations with regard to Tile Shop's internal policies required them to make certain disclosures pursuant to Item 404 of SEC Regulation S-K, Rule 4-08(k)(1) of Regulation S-X, and applicable accounting rules under U.S. Generally Accepted Accounting Principles ("GAAP") including but not limited to Accounting Standards Codification 850-10-10.  GAAP are principles

recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practices at a particular time. The Financial Accounting Standards Board established the Accounting Standards Codification ("ASC") as the source of authoritative accounting principles to be applied by nongovernmental entities in preparing financial statements in conformity with GAAP.  Compliance with GAAP is a fundamental obligation of publicly traded companies.  Accordingly, SEC Rule 4-01(a) of Regulation S-X [17 C.F.R. §210.4-01(a)(1)] provides that financial statements that are filed with the SEC and not prepared in conformity with GAAP are presumed to be misleading and inaccurate.

30.     The misdeeds and injuries to Tile Shop alleged herein could not have occurred absent Director Defendants' complete abrogation of these fiduciary duties.

**A.     The Infitialis Article Reveals Unsafe Lead Contaminant in Tile Shop Tiles**

31.     On October 21, 2013, the website "SeekingAlpha.com" published Infitialis' article titled "The Tile Shop: Poisoned Tile, Bad Actors, Unsustainable Margins, And A Stock Ready To Crack" (the "Lead Tile Article").  The Lead Tile Article revealed that, according to independent laboratory testing, Tile Shop stores had been selling tiles containing amounts of lead in excess of the total lead content limit of the CPSC.  In some cases, the test result indicated lead concentrations of 13,900% greater than CPSC limits.

32.     The Lead Tile Article detailed Infitialis' investigation.  Acting on a tip received from an anonymous whistleblower, Infitialis collected tile samples from the Company's retail locations in the East Coast, Midwest and Western regions of the U.S. Infitialis then had the tiles individually logged/tagged, split-sampled, and bagged, and

sent to CPSC and ISO/IEC 17025 accredited independent laboratory for lead concentration testing using U.S. Environmental Protection Agency ("EPA") approved methodologies. The results of the tests revealed shocking levels of lead in the tiles that were tested: for example, Tile Shop's "Glass Smokey" tile (SKU 615701) contained 14,000 mg/kg of lead, which is over 13,900% in excess of the CPSC's 100 mg/kg lead safety threshold; and Tile Shop's "Egeum Azure" tile (SKU 682800) contained 1,100 mg/kg of lead, which is over 1,000% of the CPSC's 100 mg/kg safety threshold.

33.     The Company's only apparent response to the allegations of lead contamination consisted of Rucker's brief remarks during the Company's earnings conference call for the third-quarter of fiscal 2013 held on October 31, 2013. Rucker stated as follows:

> Before turning the call over to Tim for some financial color on our results, I would like to spend just a few minutes before we take questions on the issue of our product quality and our product safety which has been questioned recently[.] [L]et me first say that I take these matters very seriously and frankly personally. When I started The Tile Shop 28 years ago my mission was to provide customers with not only an exciting shopping experience but to also provide our customers with unique all natural tile products for their homes. So I take great pride in the fact that all of our products are produced from natural substances. With the use of natural substances however comes the possibility that they may contain trace [amounts of] some inorganic metals[.] [A]lso glazing compounds used in ceramics may contain small quantities of these elements[.] [H]owever during the ceramic tile manufacturing process, the process of firing the tile and the glaze at extremely high temperatures [fuses] any of these elements into the tile [and] as the result they pose no health or safety risk[.] [H]owever in an abundance of caution over the past 10 days, we have worked with our vendors around the world to revalidate that no unnatural substances are used in the manufacture, [or] fabrication of the products that we purchased[.] [W]e have also tested a number of these products ourselves[.] [I]n addition we have engaged URS [as] the worldwide provider of Engineering, Construction and Technical Services

and the leading provider of Environmental Services to validate our understanding and conclusions with respect to the overall safety of our products. Based on all of the evidence we have accumulated from these procedures coupled with the information provided by our third party experts we are able to reaffirm our longstanding conclusion that the products we sell pose no health or safety risk[.] [W]e are committed to providing our customers with the highest quality of natural stone, ceramic and glass tile products[.] [W]e will continue to expand our quality control procedures and we will provide more information on this matter on our website.

34.     To date, Director Defendants have not provided additional information regarding the lead contamination within its tiles.

**B.     The Gotham Report Discloses Related-Party Transactions**

35.     On November 14, 2013, Gotham released the report titled "The Tile Shop: Like Crazy Eddie's, But With An Undisclosed Related Party and A Chinese Twist" (the "Related Party Report"). The Related-Party Report alleged, among other things, that the Company failed to report a number of significant related-party transactions with a Chinese entity named Beijing Pingxiu. Specifically, the Related-Party Report alleged that Beijing Pingxiu was controlled by Nishi, an employee of Tile Shop who also happened to be the brother-in-law of the Company's President and Chief Executive Officer, Rucker. The gravity of the Company's reporting violation was amplified by the fact that Beijing Pingxiu accounted for approximately 30% of the Company's 2013 cost-of-goods sold.

36.     In a press release dated the same day as the Related-Party Report, Tile Shop claimed that it had only recently been "made aware of changes of the ownership of Beijing Pingxiu [the related-party] which were not previously disclosed to the Company"

and that "[a]s a result of this disclosure, [t]he Company ha[d] suspended its relationship with [Beijing Pingxiu]."  Tile Shop also commenced an investigation into the relationship between the Company and Beijing Pingxiu.

37.   Tile Shop released the findings of its investigation in a press release dated January 27, 2014.  The press release stated in pertinent part:

- Nishi acquired [Beijing Pingxiu] in late 2011.  The investigation found that while [Beijing Pingxiu] primarily processed export transactions on an agency basis on behalf of the Company's vendors, it also operated a business model that would take title to product and resell that product to the Company.  Nishi purportedly failed to disclose to the Company the existence of this "reseller" model and his ownership of [Beijing Pingxiu].

- Nishi acquired a majority ownership interest in a vendor of the Company, Nanyang Helin Stone Co. Ltd. ("Nanyang") in 2010.  The Company purchases natural stone products including hand-crafted mosaics, listellos and accessories from Nanyang.  The same products purchased from Nanyang were also purchased from other vendors and the investigation indicated that the prices for the products purchased from Nanyang were consistent with what the company paid the other unrelated vendors for the same or similar SKUs.  Total amounts purchased from Nanyang during fiscal years 2011, 2012 and 2013 were $1.7 million, $2.1 million and $2.8 million, respectively.

- Mr. Nishi personally received payments from representatives of certain vendors over the period September 2011 through December 2013.  The investigation, which included local on-site interviews in China with some of these vendors, reported that certain vendors stated that the payments were in appreciation for consulting services provided by Mr. Nishi.  The investigation identified approximately $1.1 million that was deposited into Mr. Nishi's personal bank accounts in China over the above-referenced period.

- The investigation did not uncover any other third party relationships that require disclosure.

38.     The Company's press release also listed several actions Tile Shop would be taking in response to information discovered through its investigation.  In particular, the Company stated it would doing the following:

- The Company discontinued its relationship with [Beijing Pingxiu] as of December 1, 2013.

- Mr.  Nishi's employment was terminated effective January 1, 2014 for multiple violations of the Company's business ethics policy.  The Company will actively pursue recovery from Mr. Nishi of all monies he received from sources other than the Company while he was an employee of the Company.

- The Company is establishing new procedures to ensure that it has complete visibility to its vendors' invoices.

- The Company has notified Nanyang that it will continue business with Nanyang only if Mr.  Nishi's ownership is transferred to an unrelated party and Mr.  Nishi is not an officer or director of Nanyang.

- The Company is establishing a new export trading company which would be operated by Company employees, so as to properly identify and fully control all vendor invoices, vendor relationships and vendor payments.

- The Company will install multiple points of contact with vendors and rotate primary vendor relationships every 24 months.

- The Company will reorganize purchasing oversight responsibilities and implement additional segregation of duties and control procedures.

39.     The details of the Related-Party Report have been corroborated by several former employees and Tile Shop's co-founder, Rodney Sill, who were mentioned in the consolidated class action lawsuit against the Company, its directors and officers and underwriters for violation of federal securities laws, captioned *Beaver County Employees´ Retirement Fund et al. v. Tile Shop Holdings, Inc., et al.*, Civ.  No.  0:14-cv-

00786-ADM-TNL, currently pending in the U.S. District Court for the District of Minnesota.

**C.     Plaintiff Demands an Inspection of the Company's Books and Records**

40.     Plaintiff served his books and records demand on February 21, 2014.  In strict accordance with Section 220, Plaintiff's demand was signed, notarized, and included true and accurate copies of Plaintiff's brokerage account statement and power of attorney in favor of Levi & Korsinsky LLP.  Plaintiff's suspicion of wrongdoing and mismanagement on the part of the Board was based on Tile Shop's failure to report significant related-party transactions and Tile Shop's sale of tiles containing dangerous levels of lead, as reported by Gotham and Infitialis.

41.     On June 19, 2014, following several communications between Plaintiff and Tile Shop, Tile Shop provided 42 pages of heavily redacted material, which comprised the entirety of the documents that Tile Shop was willing to produce voluntarily.  Upon careful review of the production, it became apparent that a number of documents were either omitted from the production or produced but redacted to such a degree that the contents of those materials were unidentifiable.

42.     Following the commencement of a lawsuit in the Court of Chancery of the State of Delaware pursuant to Delaware General Corporation Law § 220, Tile Shop produced an additional 1,022 pages of documents over the course of three separate productions spanning several months.  Collectively, in response to Plaintiff's books and records demand, Tile Shop produced 1,064 pages of documents bates stamped "TILE

SHOP_MOK 000001" through "TILE SHOP_MOK 001064".  Tile Shop produced these documents subject to a Confidentiality Agreement dated June 23, 2014.

43.    Plaintiff served a second books and records demand on December 19, 2014. This second demand was focused on obtaining documents relating to Defendant Rucker's October 28, 2014 announcement to resign as Chief Executive Officer.  Subject to the terms of the above-referenced Confidentiality Agreement, Tile Shop produced documents bates stamped "TILE SHOP_MOK 001065" through "TILE SHOP_MOK 001092" on February 13, 2015.

44.    Finally, in response to further requests related to Plaintiff's first books and records demand, Tile Shop produced documents bates stamped "TILE SHOP_MOK 001093" through "TILE SHOP_MOK 001101" on March 3, 2015.   These documents were similarly produced pursuant to the terms of the above-referenced Confidentiality Agreement.

**D.    Tile Shop Lacks Adequate Controls to Protect against Harmful Contaminants**

45.    Tile Shop has been sourcing from China since at least 2008.  China is notorious for the export of products and goods containing harmful contaminants.  "In fact, the U.S. government regularly stops more poisonous or faulty products at the border that were imported from [China] than from any other nation.  In April 2011, for example, the Food and Drug Administration issued 197 import refusals for Chinese goods, compared to 107 for India and 105 for Mexico, the two next most prolific purveyors of bad merchandise."  (Brett Decker & William C. Triplett, II, Bowing to Beijing: How

Barack Obama is Hastening America's Decline and Ushering a Century of Chinese Domination (2011).)

46.    Federal regulations attempt to protect consumers from the risk of contamination.    Corporations have a clear duty to report incidents of potentially hazardous product defects:

> If you are a manufacturer, importer, distributor, and/or retailer of consumer products, you have a legal obligation to immediately report the following types of information to the CPSC:
>
> - A defective product that could create a substantial risk of injury to consumers;
>
> - A product that creates an unreasonable risk of serious injury or death;
>
> - A product that fails to comply with an applicable consumer product safety rule or with any other rule, regulation, standard, or ban under the CPSA or any other statute enforced by the CPSC;
>
> - An incident in which a child (regardless of age) chokes on a marble, small ball, latex balloon, or other small part contained in a toy or game and that, as a result of the incident, the child dies, suffers serious injury, ceases breathing for any length of time, or is treated by a medical professional; and
>
> - Certain types of lawsuits. (This applies to manufacturers and importers only and is subject to the time periods detailed in Sec. 37 of the CPSA.)
>
> Failure to fully and immediately report this information may lead to substantial civil or criminal penalties.  CPSC staff's advice is "when in doubt, report."

(Duty to Report to CPSC: Rights and Responsibilities of Businesses, http://www.cpsc.gov/en/Business--Manufacturing/Recall-Guidance/Duty-to-Report-to-the-CPSC-Your-Rights-and-Responsibilities/, last visited Mar. 12, 2015.)

47.    Federal law, in fact, provides as follows

(b) Noncompliance with applicable consumer product safety rules; product defects; notice to Commission by manufacturer, distributor, or retailer

Every manufacturer of a consumer product, or other product or substance over which the Commission has jurisdiction under any other Act enforced by the Commission (other than motor vehicle equipment as defined in section 30102 (a)(7) of title 49), distributed in commerce, and every distributor and retailer of such product, who obtains information which reasonably supports the conclusion that such product—

(1) fails to comply with an applicable consumer product safety rule or with a voluntary consumer product safety standard upon which the Commission has relied under section 2058 of this title;

(2) fails to comply with any other rule, regulation, standard, or ban under this chapter or any other Act enforced by the Commission;

(3) contains a defect which could create a substantial product hazard described in subsection (a)(2) of this section; or

(4) creates an unreasonable risk of serious injury or death,

shall immediately inform the Commission of such failure to comply, of such defect, or of such risk, unless such manufacturer, distributor, or retailer has actual knowledge that the Commission has been adequately informed of such defect, failure to comply, or such risk. A report provided under paragraph (2) may not be used as the basis for criminal prosecution of the reporting person under section 1264 of this title, except for offenses which require a showing of intent to defraud or mislead.

15 U.S.C. § 2064(b).

48.    The above statute defines a "substantial product hazard" as "a product defect which (because of the pattern of the defect, the number of defective products distributed in commerce, the severity of the risk, or otherwise) creates a substantial risk of injury to the public."  By enacting this section, Congress intended that the CPSC, not manufacturers of defective products, have all relevant information in their possession to

protect the public. *See U.S. v. Advance Mach. Co.*, 547 F. Supp. 1085, 1090 (D.C. Minn. 1982) ("In enacting 15 U.S.C. § 2064(b), Congress intended to increase the likelihood that a substantial product hazard will come to the attention of the Commission in a timely fashion so that it could act swiftly to protect the consuming public.").

49. ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████

50.     Publicly, Director Defendants' only response to the Lead Tile Article was to allow Rucker's misleading and inaccurate statement during the Company's investor conference call held on October 31, 2013.  As related previously, Rucker stated: "I take these matters very seriously and frankly personally"; "With the use of natural substances however comes the possibility that they may contain trace [amounts of] some inorganic metals"; "in an abundance of caution over the past 10 days, we have worked with our vendors around the world to revalidate that no unnatural substances are used in the manufacture, [or] fabrication of the products that we purchased"; "[W]e have also tested a number of these products ourselves"; "Based on all of the evidence we have accumulated from these procedures coupled with the information provided by our third party experts we are able to reaffirm our longstanding conclusion that the products we sell pose no health or safety risk"; "[W]e will continue to expand our quality control procedures and we will provide more information on this matter on our website."

51.    Contrary to these statements, Tile Shop's tiles did in fact contain dangerous levels of lead contamination and posed a dangerous risk to consumers.  Moreover, Tile Shop's Board was in fact not exercising any increased precautions with regard to this health and safety risk.

52.    ███████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████

53.    ███████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████

54.   ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████

55.   The significant presence of lead identified in Tile Shop's tiles proves certain Company statements false.  Tile Shop marketed itself on the premise that it produces safe, organic products.  The presence of lead raises suspicions as to who approved these statements, including Defendant Rucker's statements on October 31, 2013 (after the receipt of Bureau Veritas' results), and on what grounds they were made. Director Defendants' ability to make the statements they did is evidence of the complete

lack of and/or entirely grossly deficient internal controls with regard to oversight of product safety and disclosure.

56. ██████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████

57. ██████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████

58.     Director Defendants are aware of the risk of contamination, yet continue to do nothing to prevent it and/or disclose it.  Director Defendants' acts and/or omissions with regard to the Company's absence of appropriate controls and disclosures concerning product safety constitute a breach of fiduciary duty for which they are, and continue to be, liable.

**E.     Tile Shop Lacks Adequate Controls to Detect and Disclose Related-Party Transactions**

59.     Defendant Rucker founded the Company in 1985 and has maintained tight control over its business and operations ever since.  Rucker personally is involved in identifying and transacting business with the Company's foreign suppliers.  According to investor presentations prepared by the Company in January 2013 for the ICR XChange Investor Conference, the Company "controls the entire process" and Rucker himself is "personally involved in 'sourcing.'"  (Tile Shop Form 8-K filed Jan. 17, 2013, Exhibit 99.1, pp. 6, 14.)

60.     Between 2012 and 2013, Tile Shop sourced approximately 60% of its products from Asia.  (Tile Shop Form 10-K filed March 18, 2013, p. 3; Tile Shop Form 10-K filed February 28, 2014, p. 5.)  Unbeknownst to Tile Shop and the Company's stockholders at the time, at least three of the Company's Chinese suppliers were owned or controlled by Defendant Nishi.

61.     ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████

62.     ████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████

63.     The third related-party supplier was Best Cheer Stone Group LTD ("Best Cheer").  The Tile Shop and the Company purchased approximately $0, $0.4 million and $1.1 million of product from Best Cheer Stone during the 2011, 2012 and 2013 fiscal years, representing less than and/or approximately 1% of the Company's total inventory purchases for each of the years.  Nishi was a director and 10% owner of "Best Cheer Construction Materials (Shanghai) Co. Ltd.", of which Best Cheer was a 10% owner as well.  Another entity, Best Cheer Development Limited, owns approximately 50% of "Best Cheer Construction Materials (Shanghai) Co. Ltd."

64. ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████

65.     Director Defendants should have implemented and maintained a series of internal controls designed to detect, identify, and prevent illicit related-party transactions. Had any appropriate system of internal controls been in place, Director Defendants would have identified the "red flags" within the Company and would have prevented (or, at the very least, minimized) the transactions with BP, Nanyang, and Best Cheer that resulted in damage to the Company.

1.     Red Flag—Failure to Discover Multiple Related-Party Transactions Spanning Several Years

66. ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

67. ████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████

68.     The fact that Director Defendants were allegedly unaware of the related-party transactions for such an extended period of time is further evidence of the lack of controls and/or failure/refusal to follow/enforce them, especially considering the fact that Tile Shop had previously dealt with fraudulent conduct in the context of its China sourcing efforts.

69.     Tile Shop first encountered trouble with its Chinese suppliers in 2008.  At that time, Tile Shop was transacting business with a number of foreign suppliers and third-party export trading companies.  In 2008, Tile Shop suffered an incident involving a Chinese supplier named Manjazz Rauf Ceramics Co. ("Manjazz") and a third-party export trading company.  Tile Shop had placed an order with Manjazz.  It then received product fulfilling the order and sent approximately $100,000 to the export trading company.  Subsequently, upon determining that the product was of an inferior quality, Tile Shop complained to Manjazz.  Manjazz informed Tile Shop that they had never received an order and did not fulfill the order at issue.  Upon investigation, Tile Shop

discovered that an employee of Manjazz had intercepted the order and conspired with the third-party export trading company to divert the order and substitute it with product from another supplier. The Manjazz employee and third-party export trading company profited by buying lesser quality product at a discounted rate and pocketing the difference.

70. Tile Shop's previous experience with deception and fraudulent conduct should have alerted Director Defendants to the risk of potentially fraudulent and/or improper conduct amongst its Chinese vendors. Yet, Director Defendants paid no mind to the risk and allowed the Company to operate with grossly deficient controls relating to related-party transactions.

 2. <u>Red Flag—The Board Allowed Nishi Free Reign Over Inventory Purchases From China</u>

71. During the 2011, 2012 and 2013 fiscal years, Nishi was employed by Tile Shop as a "purchasing supervisor." Notwithstanding the presence of several internal corporate policies relating to inventory purchasing, Nishi was allowed to remain virtually unchecked as he siphoned millions of dollars from the Company.

72. First and foremost, Tile Shop's "International & Finished Goods Purchased" policy was utterly useless in terms of detecting related-party transactions. The policy, which purportedly governed the process by which the Company ordered new inventory, required Defendant Rucker and Joseph Kinder (Senior VP of Operations) to initially authorize all new items. Once authorized, Kinder would then create an item number and Tile Shop's purchasing agents would proceed with ordering.

73. ████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████

74. ████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
██████████

75. ████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

███████████████████████████████

76.    ████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

███████████████████████████████████

77.    ████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

███████████████████████████

78.    ████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████

79.     The uselessness of the several policies discussed above—the "Wire Payments" policy, "Invoice Approval Matrix," "Expense & Payables Process," and "International & Finished Goods Purchased" policy—is exacerbated by the fact that the Board already knew of the close familial relationship between Rucker and BP (*i.e.*, that BP was owned and controlled by Rucker's nephew and the nephew's father).  Given the Board's awareness of the relationship between Rucker and the Chinese trading company at issue, the above red-flags are considerably more egregious and deserve special attention.  Having already been damaged by a fraudulent third-party export company in 2008, Tile Shop's oversight over its transactions with Chinese suppliers was egregiously deficient.

3.     Red Flag—Little-to-No Consideration of the Related-Party Transaction

80.     Tile Shop created entities in foreign countries for the purpose of controlling supplier relationships.  These entities were created with little-to-no oversight by the Board or the Audit Committee.

81. █████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████

82.     During the 2011, 2012, and 2013 fiscal years, Tile Shop utilized BP for coordinating the export process on behalf of Chinese vendors, which includes processing export paperwork, managing registration of exports with the Chinese government, invoicing and receiving payments from the purchaser, and processing payments to sellers. Qualitatively and quantitatively, BP's value to Tile Shop was significant—the total amount of payments processed by and through BP during the years ended December 31, 2011, 2012 and 2013 was $6.3 million, $12.5 million and $16.9 million, respectively.

83. █████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████

████████████████████████████████████████████

████████████████████

84.    Following the Audit Committee's "discuss[ion]," the Audit Committee "approved" the continued use of the transactions with BP.  In other words, although the Board was aware of the relationship between Rucker and the export company's owners, the Board continued to operate without a second thought.

85.    ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████

86.    ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████

87.    With Tile Shop's history of Chinese exporting problems and little oversight of its Chinese purchasing, Tile Shop's Board should have been paying attention to BP's operations.  It was this precise level of deficient oversight that fostered an environment in which Nishi was ultimately allowed to siphon hundreds of thousands (if not millions) of dollars away from the Company in lost profit and corporate opportunity.  Had the Board spent any sufficient amount of time and/or effort questioning who, what, when, where, why, or how BP did what it did, the Board may have very well been able to identify Tile Shop's transactions with BP as "related" and prevent the damage caused to the Company.

### 4.    Red Flag—Failure to Follow Existing Controls

88.    Even with regard to the few controls that were in place, the Director Defendants failed to follow them.

89.    ████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

90.

91.

92.

5.      Red Flag—No Finding of Material Weakness

93.      ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

  ██  ██████████████████████████

  ██  ████████████████████████████████████

  ██  ████████████████████████████████████████
       ████████████████████████████

  ██  ████████████████████████████████████
       ████████████████████████████

  ██  ████████████████████████████████████████
       ████████████████████████████████████
       ██████████████████

94.      The fact that Tile Shop's former Chief Financial Officer was able to arrive at this conclusion, and that Director Defendants affirmed this conclusion by allowing its disclosure, is further evidence that the Company had and continues to have in place grossly deficient controls incapable of detecting and reporting related-party transactions.

**F.      Director Defendants Have Damaged Tile Shop**

95.      Following the accusations contained within the Lead-Tile Article and the Related-Party Report, Tile Shop became the subject of a class action securities fraud

lawsuit.  The lawsuit, styled *Beaver County Employees´ Retirement Fund et al. v. Tile Shop Holdings, Inc., et al.*, Civ.  No.  0:14-cv-00786-ADM-TNL, alleges that Tile Shop (in addition to certain of its directors and officers) misled investors by failing to truthfully disclose the related-party transactions between the Company and Nishi's various enterprises.  Tile Shop, in response, has been forced to spend hundreds of thousands of dollars in attorneys' fees and investigation costs in defending itself against the lawsuit. Considering the fact that the plaintiffs in the class action lawsuit recently defeated the defendants' motion to dismiss, additional defense costs are certain.

96.     Tile Shop's stock price also declined in the wake of the Lead-Tile Article and the Related-Party Report.  On October 18, 2013, Tile Shop's stock closed at $25.87 per share.  Following the release of the Lead-Tile Article on October 21, 2013 (the next trading day), Tile Shop's stock closed at $23.79.  On November 13, 2013, Tile Shop's stock closed at $21.22 per share.  After the release of the Related-Party Report the following day on November 14, 2013, the stock closed at $12.95 per share.  Tile Shop stock currently trades under $11 per share.  Tile Shop's stock price evidences the investing public's lack of confidence in Tile Shop due to Director Defendants' apparent inability to exercise due oversight.  Tile Shop may never regain investor confidence.

97.     Additionally, Tile Shop was deprived of a hundreds of thousands of dollars in additional revenue and/or savings due to Director Defendants' inability and/or failure to detect Nishi's involvement in the Company's transactions.  To date, Director Defendants have recovered $200,000 from Nishi, or roughly 1% of the total payments made to BP in fiscal 2013 alone.  Tile Shop is entitled to at least the $1.1 million Nishi

personally profited while working for Tile Shop in his capacity as a purchasing supervisor.  Discovery may reveal this amount to be far greater.

98.    Finally, Director Defendants' breaches of their fiduciary duties have proximately caused, and will continue to cause, Tile Shop to suffer substantial monetary damages as a result of the wrongdoing herein, as well as further and even greater damage in the future, including, among other things:

- Exposure to forfeitures, fines and penalties;

- Damage to Tile Shop's reputation and good will (including perhaps irreparable damage to Tile Shop's reputation and credibility with customers, and to Tile Shop's reputation and credibility in the business and financial community);

- Resultant loss of business and business opportunities;

- Increased costs of capital;

- Increased loss in market value and shareholder equity;

- Resulting in the payment of legal fees and related expenses incurred and to be incurred by Tile Shop in connection with potential investigations;

- Potential fines pursuant to federal regulations; and

- Resulting payments of legal fees, costs and potentially huge amounts payable in settlement or satisfaction of claims by injured parties.

## DERIVATIVE ALLEGATIONS

99.    Plaintiff brings this action derivatively and for the benefit of Tile Shop to redress injuries suffered, and to be suffered by Tile Shop, as a direct result of Director Defendants' breaches of their fiduciary duties as directors and/or officers of Tile Shop.

100.    Tile Shop is named solely as a nominal party in this action.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

101.    Plaintiff is, and has been, a Tile Shop shareholder since May 2013. Plaintiff will adequately and fairly represent the interests of Tile Shop in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND IS EXCUSED

102.    Tile Shop's current Board consists of the Defendants Peter J. Jacullo, III, Peter H. Kamin, Todd Krasnow, Robert A. Rucker, Adam L. Suttin, William E. Watts, and non-party Christopher Cook.  Demand is excused because the majority of the Board members are either interested or lack independence with respect to the allegations contained herein, and would be unable to properly consider a demand if made and/or pursue litigation against the responsible individuals.  Additionally, the majority of the Board members face a strong likelihood of personal liability in connection with the allegations contained herein, and therefore would be unable to properly consider a demand if made and/or pursue litigation against the responsible individuals (*i.e.*, themselves).

103.    **Robert A. Rucker.**  Rucker is the founder of Tile Shop and, until January 1, 2015, served as its longtime Chief Executive Officer.  Since January 1, 2013, Tile Shop paid Rucker a base salary of $500,000 per year.  In 2011 and 2012, Rucker's total compensation from Tile Shop (and/or Tile Shop Predecessor) was $2 million and $5.8 million, respectively.  While Rucker recently resigned from his position as Chief Executive Officer, he is continuing as an "advisor" to the new Chief Executive Officer (Chris Homeister) in exchange for a nominal salary of $455 per week plus "replacement

benefits" that will be "comparable to his current benefits" which, considering the current cost of healthcare, are materially valuable.  (TILE SHOP MOK 001091.)  Rucker has collected millions of dollars in connection with his position at the Company and would therefore be unable to independently consider a demand.

104.   Additionally, Rucker would be unable to consider a demand because he faces a strong likelihood of personal liability and is therefore not disinterested.   In conjunction with his position as Chief Executive Officer, Rucker oversaw Tile Shop's Chinese sourcing operations and was responsible for creating the Chinese trading company underlying this lawsuit.

105.   Rucker was also related to Nishi, the individual allegedly responsible for orchestrating the related-party transactions.  As the United States District Court, District of Minnesota, held in its decision denying Defendant Rucker's motion to dismiss, "Rucker's relationship with Nishi was more meaningful than just a label of affinity. Nishi worked with Rucker at Tile Shop for a number of years, where Nishi ultimately held the position of purchasing supervisor.  Rucker and Nishi also traveled overseas together to scout for new Tile Shop suppliers.  A former employee stated there was no doubt that Rucker would know exactly what Nishi was doing in his role in BP.  Another former employee claims that Rucker and Nishi's relationship was common office knowledge, and further alleges that Tile Shop employees, including a purchasing analyst, confirmed that Rucker was buying tile on the Company's behalf from Nishi." (*Beaver County Employees´ Retirement Fund et al. v. Tile Shop Holdings, Inc., et al.*, Civ.  No. 0:14-cv-00786-ADM-TNL, Docket Entry 108, pp. 22-23.)  Further, at all relevant times,

Rucker supervised Nishi (along with Joseph Kinder) and was responsible for approving orders submitted by Nishi.  And, upon discovering the related-party transactions, Rucker was tasked with certain remedial actions, including recovering funds from Nishi.

106.   Rucker is at the epicenter of the acts and/or omissions upon which this lawsuit is based and, therefore, is interested in the outcome of this lawsuit.   Given Rucker's responsibility for and/or involvement in the majority of actions discussed herein, Rucker faces a strong likelihood of personal liability and therefore would be unable to properly consider a demand.

107.   **Tile Shop's Audit Committee—Peter J. Jacullo, III, Adam L. Suttin, and Peter H. Kamin.**   Defendants Jacullo, Suttin, and Kamin are members of the Board's Audit Committee.  Pursuant to Tile Shop's Audit Committee Charter, the Audit Committee was responsible for, among other things, the following duties and obligations:

- Coordinating the Board's oversight of, and ensuring compliance with, the Company's internal control over financial reporting and disclosure controls and procedures;

- Establishing policies and procedures regarding the receipt, retention and treatment of complaints and concerns received by the Company regarding accounting, financial statement or other disclosure, internal accounting or disclosure controls or auditing matters;

- Reviewing the Company's policies and procedures for reviewing and approving or ratifying related-party transactions required to be disclosed pursuant to Item 404 of Regulation S-K, including the Company's Related Person Transaction Policy, and if necessary recommending changes to the Related Person Transaction Policy to the Board;

- Reviewing all Related Person Transactions for potential conflicts of interest on an ongoing basis in accordance with the Company's Related Person Transaction Policy, and shall be responsible for the approval and ratification of all such transactions; and

- Authorizing and conducting investigations into any matters within the scope of the Audit Committee's responsibilities as it shall deem appropriate.

108.   The Audit Committee and its members utterly failed to carry out its duties and obligations.  Instead of reviewing and approving the Company's transactions with BP, Defendants Jacullo, Suttin, and Kamin simply "rubber-stamped" their approval, as evidenced by the Audit Committee's March 8, 2013 superficial consideration of the Company's transactions with BP.

109.   The Audit Committee's neglect is especially deserving of liability considering the circumstances comprising several red flags: Nishi's free reign over all China purchasing (in stark contrast to all other overseas purchasing), the fact that BP was always owned and/or controlled by Rucker's relatives, Rucker's failure to respond to key D&O liability insurance questionnaire questions concerning related-party transactions, and Tile Shop's prior fraudulent experience with Chinese exporting companies. Notwithstanding the Audit Committee's awareness of and access to information, Defendants Jacullo, Suttin, and Kamin failed to ask any questions or conduct even the slightest investigation into how or why BP was able to continue functioning under the circumstances.

110.   The Audit Committee's failure to fulfill their obligations to the Company can be explained, in part, by its members' material ownership stakes in the Company.  As of June 3, 2013, Defendants Jacullo, Suttin, and Kamin beneficially owned and/or controlled 5,094,011 (9.6%), 634,762 (1.2%), and 483,346 (0.91%) of Tile Shop's common stock.  (Tile Shop Schedule 14A, filed June 13, 2013, p. 44.)  Based on Tile

Shop's stock price as of October 18, 2013 (the day before the release of the Lead-Tile Article), these shares were worth an aggregate of $160,707,518.  As of November 14, 2013, following the release of both the Lead-Tile Article and the Related-Party Report, the value of these shares were worth $80,446,941, *a decline of roughly 50%*.  Defendants Jacullo, Suttin, and Kamin opted to turn a blind eye in an attempt to prevent them the truth from escaping into the market.  Defendants Jacullo, Suttin, and Kamin have already lost millions of dollars with respect to the value of their stock.  Commencing an investigation and disclosing further details concerning their lack of oversight to the public would undoubtedly result in additional losses.

111.    Given the Audit Committee's responsibility for and/or involvement in the majority of actions discussed herein, Defendants Jacullo, Suttin, and Kamin face a strong likelihood of personal liability for failing to comply with their obligations under the Audit Committee Charter (as well as GAAP and Accounting Standards Codification 850) and therefore would be unable to properly consider a demand.

112.    **Tile Shop's Nominating and Corporate Governance Committee—Peter H. Kamin and Todd Krasnow.**  Defendants Kamin and Krasnow are members of the Board's Nominating and Corporate Governance Committee.  Pursuant to Tile Shop's Nominating and Corporate Governance Committee Charter, the Nominating and Corporate Governance Committee was responsible for, among other things, the following duties and obligations:

- Considering, developing, and recommending to the Board policies and procedures with regard to the nomination of directors or other corporate governance matters;

- Considering and making recommendations to the Board with regard to any proposed changes to the Company's certificate of incorporation, bylaws, or other corporate governance guidelines, policies or procedures;
- Approving the charter for each committee of the Board;

- Overseeing an annual self-evaluation of the Board to determine whether it, and its committees, are functioning effectively;

- Overseeing, and ensuring compliance with, the Company's corporate governance policies and its Code of Business Conduct and Ethics; and

- Conducting or authorizing investigations into any matters within the scope of its responsibilities as it shall deem appropriate.

113.    Similar to Tile Shop's Audit Committee, its Nominating and Corporate Governance Committee failed to carry out its duties and obligations.  Not only did the Nominating and Corporate Governance Committee fail to hold the Audit Committee accountable for its blatant neglect over the Company's highly questionable transactions with BP, but it also failed to hold the Board accountable with respect to the Lead-Tile Article and the lead testing results.  Defendants Kamin and Krasnow failed to enforce any disclosure or implement any substantive internal controls in the wake of the positive test results.

114.    Defendants Kamin and Krasnow were also responsible for enforcing the Company's Code of Business Conduct and Ethics.  Significantly, Tile Shop's Code of Business Conduct and Ethics required employees, directors and officers to: disclose and avoid actual and potential conflicts of interest; refuse employment by or with any of Tile Shop's material customers or suppliers; decline business transactions with any family members (including brother-in-laws); abstain from any business opportunity which could benefit the Company; and timely report all material financial and non-financial

information.  Further, Tile Shop's Code of Business Conduct and Ethics also required all employees and directors to comply with all applicable environmental, health and safety laws, and report any noncompliance with such laws to the Company.  To the extent Tile Shop was permitted by Defendants to engage in a prolonged series of related-party transactions as well as sell an unknown number of lead-contaminated tiles to the public, Defendants Kamin and Krasnow face a strong likelihood of personal liability for failing to comply with their obligations under the Nominating and Corporate Governance Committee Charter.

115. **Tile Shop's Board—Peter J. Jacullo, III, Peter H. Kamin, Todd Krasnow, Robert A. Rucker, Adam L. Suttin, William E. Watts.**  As mentioned above, Tile Shop's Code of Business Conduct and Ethics required directors to comply with public safety laws and timely disclose pertinent information.  Pertinently, the Code of Business Conduct and Ethics to comply with all applicable environmental, health and safety laws and, in the event of noncompliance, report it.  To date, Director Defendants are aware of the risk of lead-contamination, yet continue to do nothing to prevent it. Moreover, Director Defendants have yet to correct Rucker's misstatements on October 31, 2013, a week after they received the Bureau Veritas results.

116. Similarly, Director Defendants violated disclosure requirements applicable to Tile Shop's related-party transactions.  These violations were the result of a corporate environment lacking any sufficient internal controls regarding the identification, disclosure, and/or prevention of improper related-party transactions.  The fact that Tile Shop's former Chief Financial Officer was permitted to state that the Company did not

have a material weakness in terms of their internal controls over related-party transactions is further evidence that this harmful corporate environment persists to the current day.

117.   Director Defendants' acts and/or omissions with regard to the Company's absence of appropriate controls concerning product safety and related-party transactions constitute a breach of fiduciary duty for which they are, and continue to be, liable.  Each Defendant faces a strong likelihood of personal liability for these ongoing breaches and, for that reason, cannot properly consider a demand.

118.   **Pre-Existing Business Relationships—Adam L. Suttin and William E. Watts and Peter J. Jacullo, III, Peter H. Kamin, Todd Krasnow, and Robert A. Rucker.**  Defendants Suttin and Watts are longtime associates and colleagues.  Suttin served as president of an entity named JWC Acquisition Corp. in addition to co-founding J.W. Childs Associates, L.P., a private equity investment firm, in 1995, of which Suttin remains a partner.  Watts, prior to joining Tile Shop, served as vice president of JWC Acquisition Corp. and has been an operating partner of J.W. Childs Associates, L.P., since June 2001.  Accordingly, Suttin and Watts have been doing business together for roughly the past 15 years.  This longstanding business relationship creates a conflict that prevents Watts (as Chairman of the Board) from authorizing legal action against Suttin and Suttin (as a member of the Audit Committee) from holding Watts accountable for failing to oversee the Board's actions.  Neither Watts nor Suttin could properly consider a demand against the other.

119.   Similarly, Defendants Jacullo, Krasnow, and Kamin have been working with and for Rucker and Tile Shop's predecessor, The Tile Shop, Inc., since 2007 (in the case of Jacullo) and 2012 (in the cases of Krasnow and Kamin).   Defendant Rucker controlled The Tile Shop, Inc., which means that Jacullo, Krasnow, and Kamin have a longstanding history of executing Rucker's directives.   Further, in connection with Tile Shop's creation, Jacullo, Krasnow, and Kamin each received significant consideration in exchange for their respective interests in The Tile Shop, Inc.   Jacullo received $11.8 million in cash, $11.7 million in promissory notes, and almost 5.5 million shares of Tile Shop common stock.   Krasnow received approximately $300,000 in cash, $300,000 in promissory notes, and 143,384 shares of Tile Shop common stock.   Kamin received approximately $1.2 million in cash, $1.2 million in promissory notes, and 575,478 shares of Tile Shop common stock.   (Tile Shop Schedule 14A, filed June 13, 2013, p. 39.) Considering the significant amount of consideration received in exchange for their interests in The Tile Shop, Inc., Jacullo, Krasnow, and Kamin each held material interests in The Tile Shop, Inc., and likely received a material amount of the predecessor-company's earnings.   Consequently, in light of these longstanding business relationships, Jacullo, Krasnow, and Kamin are unable to independently consider a demand against Rucker or pursue him in the event that he should be pursued.

## COUNT I

(Breach of Duty of Loyalty as to Director Defendants)

120.   Plaintiff incorporates by reference and realleges each and every allegation set forth above as if set forth fully herein.

121.    Director Defendants owed and owe Tile Shop fiduciary obligations.  By reason of their fiduciary relationships, Director Defendants owed and owe Tile Shop the highest obligation of good faith, fair dealing, loyalty and due care.

122.    Each of the Director Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

123.    Director Defendants had actual or constructive knowledge that they had caused the Company to improperly misrepresent the condition of the Company and failed to correct the Company's public issuances.

124.    Director Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.

125.    Such material misrepresentations and/or omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Tile Shop securities and/or preserving Director Defendants' self-interests above and beyond those of the Company.

126.    These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

127.    As a direct and proximate result of Director Defendants' failure to perform their fiduciary obligations, Tile Shop has sustained significant damages.  As a result of the misconduct alleged herein, Director Defendants are liable to the Company.

128.    Plaintiff, on behalf of Tile Shop, has no adequate remedy at law.

## COUNT II

(Unjust Enrichment as to Fumitake Nishi)

129.   Plaintiff incorporates by reference and reallege each and every allegation set forth above as if set forth fully herein.

130.   As a direct and proximate result of Director Defendants' breaches of fiduciary duties, Fumitake Nishi has received excessive and unwarranted payments and benefits as alleged herein.

131.   ████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████

132. █████████████████████████████████████████
█████████████████████████████████████████████████
█████████████████████████████████████████████████
█████████████████████████████████████████████████
█████████████████████████████████████████████████
███████████████████████████████

133. █████████████████████████████████████████
█████████████████████████████████████████████████
█████████████████████████████████████████████████
█████████████████████████████████████████████████
█████████████████████████████████████████████████
██████████████████████████████████████

134. █████████████████████████████████████████
█████████████████████████████████████████████████
█████████████████████████████████████████████████
█████████████████████████████████████████████████
█████████████████████████████████████████████████
██████████████████████████████████████

135. █████████████████████████████████████████
█████████████████████████████████████████████████
█████████████████████████████████████████████████
█████████████████████████████████████████████████

136. ████████████████████████████████████████

137. It would be unconscionable and against the fundamental principles of justice, equity, and good conscience for Fumitake Nishi to retain the payments and benefits he has received when, at the same time, he has caused and will cause so much damage to the Company.

138. To remedy Fumitake Nishi's unjust enrichment, the Court should order him to disgorge to the Company any and all payments he received from third-parties while under the employ of Tile Shop.

**COUNT III**

(Aiding and Abetting Unjust Enrichment as to Robert A. Rucker)

139.   Plaintiff incorporates by reference and realleges each and every allegation set forth above as if set forth fully herein.

140.   █████████████████████████████████████████████
█████████████████████████████████████████████████████
█████████████████████████████████████████████████████
█████████████████████████████████████████████████████
█████████████████████████████████████████████████████
██████████████████████████████████

141.   █████████████████████████████████████████████
█████████████████████████████████████████████████████
█████████████████████████████████████████████████████
█████████████████████████████████████████████████████
█████████████████████████████████████████████████████
█████████████████████████████████████████████████████
█████████████████████████████████████████████████████
█████████████████████████████████████████████████████
████████████████████████████████████████████████

142.   As the United States District Court, District of Minnesota, held in its decision denying Defendant Rucker's motion to dismiss, "Rucker's relationship with Nishi was more meaningful than just a label of affinity.  Nishi worked with Rucker at

Tile Shop for a number of years, where Nishi ultimately held the position of purchasing supervisor.  Rucker and Nishi also traveled overseas together to scout for new Tile Shop suppliers.  A former employee stated there was no doubt that Rucker would know exactly what Nishi was doing in his role in BP.  Another former employee claims that Rucker and Nishi's relationship was common office knowledge, and further alleges that Tile Shop employees, including a purchasing analyst, confirmed that Rucker was buying tile on the Company's behalf from Nishi."  (*Beaver County Employees´ Retirement Fund et al. v. Tile Shop Holdings, Inc., et al.*, Civ.  No.  0:14-cv-00786-ADM-TNL, Docket Entry 108, pp. 22-23.)

143.   ████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████

144.   ████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████

145.   ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████   Rather than actively secure funds from Nishi, Rucker facilitated Nishi's escape from the jurisdiction all the while providing cover so as to prevent further recovery against him.

146.   Defendants Rucker conduct with respect to Nishi is that of aiding and abetting and has resulted in damage to the Company.  According to reports, Nishi received over $1.1 million in improper payments while working under the employ of Tile Shop.  Had this money been recovered in a timely and complete manner, it could have been utilized by Tile Shop to offset the gross costs associated with the Company's internal investigations, defense costs, and likely settlement proceeds.

147.   Tile Shop has been damaged as a result of Nishi's acts and/or omissions. For aiding and abetting Nishi in the course of his conduct, Defendant Rucker is jointly and severally liable for the damage caused to Tile Shop.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.     Awarding the Company the amount of damages it sustained as a result of Director Defendants' breaches of fiduciary duties;

B.     Compelling Robert A. Rucker and/or Fumitake Nishi to disgorge to the Company the money to offset damages incurred by the Company as a result of their acts and/or omissions;

C.     Awarding to Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees and expenses; and

D.     Granting such other and further relief as the Court deems just and proper.

Dated:  March 23, 2015

**ZIMMERMAN REED, PLLP**

By: */s/ Patricia A. Bloodgood*
Carolyn G. Anderson, No. 275712
Patricia A. Bloodgood, No. 157673
1100 IDS Center, 80 South 8th Street
Minneapolis, MN 55402
Tel:    612.341.0400
Fax:    612.341.0844
Carolyn.Anderson@zimmreed.com
Patricia.Bloodgood@zimmreed.com

**LEVI & KORSINSKY, LLP**
Nicholas I. Porritt
Adam M. Apton
1101 30th Street N.W., Suite 115
Washington, D.C.  20007
Tel:    202.524.4859
Fax:    202.333.2121
NPorritt@zlk.com
AApton@zlk.com

*Counsel for Plaintiff Kinkeung Mok*